## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br>1700 G Street, NW<br>Washington, DC 20552<br><br>Plaintiff,<br><br>v.<br><br>NATIONSTAR MORTGAGE LLC,<br>d/b/a MR. COOPER,<br>8950 Cypress Waters Boulevard<br>Coppell, TX 75019<br><br>Defendant. | Case No. 1:20-cv-3550 |

## COMPLAINT FOR A PERMANENT INJUNCTION
## AND OTHER RELIEF

1.      The Bureau of Consumer Financial Protection ("Bureau") brings this action against Nationstar Mortgage LLC, d/b/a Mr. Cooper ("Nationstar" or "Defendant") under Sections 1054 and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5564 and 5565. Nationstar is one of the largest mortgage servicers, and the largest non-bank mortgage servicer, in the United States. Nationstar violated multiple federal consumer financial laws, causing substantial harm to the borrowers whose loans it serviced. Between January 1, 2012 and December 31, 2015, Nationstar: (1) failed to identify thousands of loans with existing in-flight modifications and, as a result, failed to recognize some transferred loans with pending loss mitigation applications or trial modification plans, or failed to identify and honor other borrowers' loan modification agreements; (2) foreclosed on borrowers to whom it had promised foreclosure holds while they applied for loss mitigation relief; (3) improperly increased borrowers' permanent, modified monthly loan payments; (4) failed to timely disburse borrowers'

1

tax payments from their escrow accounts; (5) failed to properly conduct escrow analyses for borrowers during their Chapter 13 bankruptcy proceedings; and (6) failed to timely remove private mortgage insurance from borrowers' accounts. Each of these acts or failures violated the law.

2.      The Bureau brings this action against Defendant under: (1) Sections 1031 and 1036 of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536; (2) Sections 6 and 19 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2617, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. § 1024 *et seq.* ("RESPA Mortgage Servicing Rule"); and (3) Sections 4902(a) and (b) of the Homeowners Protection Act of 1998, 12 U.S.C. §§ 4902(a) and 4902(b) ("HPA").

3.      The Bureau brings this action to obtain injunctive relief and other equitable relief to address and remedy Defendant's unlawful conduct; to require Defendant to pay redress to injured borrowers; and to impose civil money penalties against Defendant.

## JURISDICTION AND VENUE

4.      The Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f) because Defendant conducts business in this district, and part of the events giving rise to the claims occurred in this district.

**PLAINTIFF**

6.     The Bureau is an independent agency of the United States created by the CFPA.

12 U.S.C. § 5491(a). The Bureau is charged with enforcing federal consumer financial laws. 12

U.S.C. §§ 5563, 5564.

7.     The CFPA is a federal consumer financial law. 12 U.S.C. § 5481(14). Under

Sections 1031 and 1036 of the CFPA, it is unlawful for any covered person to commit or engage

in any unfair, deceptive, or abusive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

8.     RESPA and the HPA are federal consumer financial laws. 12 U.S.C. § 5481(12),

(14). Under Section 1036 of the CFPA, it is unlawful for any covered person "to offer or provide

to a consumer any financial product or service not in conformity with federal consumer financial

law, or otherwise commit any act or omission in violation of a federal consumer financial law."

12 U.S.C 5536(a)(1)(A). Violations of RESPA and the HPA are therefore violations of the

CFPA. *Id*.

9.     The Bureau is authorized to commence civil actions in federal district court in its

own name to address violations of federal consumer financial laws, including violations of the

CFPA. 12 U.S.C. § 5564(a), (b).

**DEFENDANT**

10.     Nationstar is a Delaware limited liability company with its principal place of

business in Coppell, Texas. Mr. Cooper is the current name under which Nationstar does

business. Nationstar engages in mortgage servicing by, among other things, processing borrower

payments, administering loss mitigation processes, and managing foreclosures. At all times

3

relevant to this complaint, Nationstar has done business in this District and throughout the United States.

11.     Defendant is a "covered person" pursuant to 12 U.S.C. § 5481(6) because it offers and provides consumer financial services, which includes "extending credit and servicing loans" and "collecting debt" related to such loans, as defined under the CFPA, 12 U.S.C. § 5481(15)(A)(i) and (x).

12.     For the purpose of RESPA, a servicer is a person "responsible for servicing of a loan." 12 U.S.C. § 2605(i)(2). Under RESPA, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan…and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

13.     Defendant is subject to RESPA as a mortgage servicer of federally related mortgage loans.

## FACTUAL ALLEGATIONS

### Company Background

14.     Defendant is the largest non-bank mortgage servicer in the United States and the third largest mortgage servicer overall.

15.     Defendant has grown aggressively over the last decade, principally by acquiring mortgage servicing rights in large-scale, or bulk, transfers. In 2011, Defendant serviced approximately 600,000 residential loans, but by 2014 that number had grown to almost two million loans.

16.     Defendant currently services the loans of over three million borrowers, with the unpaid principal balance of those loans totaling approximately $500 billion.

4

**Defendant Failed to Identify and Honor Transferred
Loan Modification Agreements**

17.    Since at least January 2012, Defendant has acquired mortgage servicing rights for many loans that were subject to trial modification agreements entered into by the borrower and the prior servicer.

18.    These existing modification agreements required borrowers to make trial payments and meet other contractual requirements. If the borrowers did so, their servicer was required to permanently modify their loans within 30 days of their successful performance under the trial modification agreements.

19.    Defendant acquired servicing rights to many loans subject to trial modification agreements where the trial period had begun but had not yet ended, or where the loan had not yet been permanently modified. Defendant frequently failed to identify loans that had been transferred from previous servicers with such pending loan modifications ("in-flight modifications") prior to servicing the loans.

20.    Because Defendant failed to identify in-flight modifications, it wrongfully denied some borrowers loan modifications or made permanent modifications to borrowers' loans only after significant delays beyond the period provided for in the trial modification agreements.

21.    In 2013, the Bureau required Defendant to review loans to which it acquired servicing rights between January 2012 and November 2013. Defendant's review identified a substantial number of loans with pending trial loan modifications that Defendant did not timely convert to permanent status within the required 30-day window after the borrower's successful completion of their trial plan. The Bureau also required Defendant to conduct a follow-up review in 2015, which again identified a substantial number of such instances of delay among loans transferred between November 2013 and March 2015.

5

**Defendant Foreclosed on Borrowers Unlawfully**

22.     In or around January 2014, Defendant foreclosed upon borrowers who had applied for loan modifications after sending the borrowers letters promising it would not foreclose while the borrowers' applications were under review, or before any applicable appeal had concluded.

23.     Contrary to Defendant's explicit written promises, it initiated foreclosures and even sold borrowers' homes while the borrowers' loss mitigation applications or appeals were pending. In at least one case, the borrower had already accepted and begun performing on the modified mortgage before being wrongfully foreclosed upon.

24.     Defendant's initiation and completion of foreclosure proceedings in 2014 for borrowers to whom it promised foreclosure holds caused significant harm to impacted borrowers. These borrowers suffered significant negative impacts, including to their finances and credit.

**Defendant Impermissibly Increased Borrowers'
Permanent Modified Monthly Payments**

25.     Defendant modified mortgages for some borrowers in financial distress under loss mitigation programs administered by the federal government, government-sponsored enterprises, or under proprietary loss mitigation programs.

26.     Before a borrower's mortgage could be permanently modified under such a program, the borrower had to meet certain basic requirements and complete a trial period with a modified, reduced monthly mortgage payment. These requirements were intended to determine whether the borrower could manage the new, lower monthly payment on a permanent basis.

27.     Defendant told some borrowers who applied for a modification that their trial monthly payments would be based on a percentage of the borrower's monthly gross income and that the payment required by a permanent modification would be based on the same percentage.

28.     Defendant sent notices to borrowers that informed these borrowers that "[their] modified payment may change if [their] property taxes or insurance premiums change," but that any such a change "should not significantly change the amount of [the borrower's] modified mortgage payment."

29.     These modification programs generally prohibited increases to a borrower's monthly trial payment, but permitted certain increases, for example those caused by changes to the borrower's taxes or insurance costs.

30.     These programs also generally prohibited "re-underwriting" a borrower's modification once the monthly payment amount has been determined for the purpose of a trial modification offer. For example, the federal government's Making Home Affordable guidelines required servicers offering its Home Affordable Modification Program ("HAMP") option to complete all underwriting to determine the modified monthly payment before the trial period plan notice is sent to borrowers.

31.     Borrowers who met the requirements of a trial period plan, including making all payments on time, were entitled to a permanent mortgage modification based on the terms of the trial modification offer, which they accepted by meeting its obligations.

32.     From 2013 through 2015, Defendant impermissibly increased the permanent monthly payments for some borrowers after those borrowers had successfully completed trial period plan payments and complied with the other applicable requirements to receive a permanent modification.

33.     In numerous instances, errors in Defendant's systems of record that were first identified in September 2014 contributed to these increases.

34.     Some borrowers for whom Defendant increased monthly payments suffered from payment shock or defaulted upon their modified loans as a result of the unilateral and unanticipated increases to their monthly mortgage payments. In the absence of changes to their taxes or insurance, borrowers had no reason to anticipate that Defendant would significantly increase their payments after they had successfully completed their trial plans.

35.     Borrowers who could not manage the unexpected increased monthly payments imposed by the Defendant were sometimes forced to seek more drastic options to avoid foreclosure, such as deeds in lieu of foreclosure or short sales. When even those alternatives were not viable options, Defendant foreclosed on some affected borrowers.

36.     In numerous instances Defendant foreclosed on borrowers whose permanent modification payments were impermissibly increased between 2013 and 2015. Others avoided foreclosure by submitting deeds in lieu of foreclosure or executing short sales.

**Defendant Mishandled Borrowers' Escrow Accounts**

37.     Defendant failed to disburse borrowers' tax payments in a timely manner. Defendant also failed to timely analyze escrow accounts for borrowers who filed for bankruptcy.

*Untimely Disbursements*

38.     When maintaining a borrower's escrow account for the payment of taxes and homeowner's insurance, mortgage servicers are required annually to: (1) estimate the amount of taxes and insurance premiums a borrower will need to pay for the upcoming year; (2) calculate the borrower's monthly escrow payment based on the borrower's estimated taxes and insurance;

8

and (3) disburse tax payments and homeowner's insurance premiums to local taxing authorities

and insurance companies throughout the year as appropriate.

39.     In many instances, between January 1, 2012 and March 15, 2015, Defendant

failed to disburse tax payments from borrowers' escrow accounts in a timely manner as required

by law.

40.     As a result, some borrowers were forced to pay unnecessary penalties, which

accrued because of Defendant's late payment of borrowers' property taxes.

*Annual Escrow Analysis*

41.     Defendant is required by federal law to perform annual escrow account analyses

on all loans for which it manages an escrow account.

42.     When performing an escrow analysis, Defendant must estimate a borrower's

future homeowner's insurance premium and tax obligations, then calculate the monthly amounts

the borrower should be charged to ensure the escrow account has sufficient funds to make

required tax and insurance payments for the year.

43.     Servicers must also accurately compute the borrower's monthly payment

obligation to determine whether any surplus, shortage, or deficiency exists in the escrow account.

44.     Under most circumstances, mortgage servicers are required to provide an annual

escrow statement to borrowers each year. Mortgage servicers are not, however, required to

provide an annual escrow statement to borrowers with escrow accounts while those borrowers

are in bankruptcy.

45.     This exception only relieves the mortgage servicer from providing the borrower

the results of the annual escrow analysis in an escrow statement; the servicer's obligation to

perform the escrow analysis remains.  This analysis enables the servicer to understand if and how

9

a borrower's tax and insurance obligations have changed during the pendency of a borrower's bankruptcy, which may create a surplus, shortage, or deficiency in the escrow account.

46.     Prior to March 2016, Defendant did not perform annual escrow analyses during the pendency of borrowers' active bankruptcies. As a result, Defendant collected monthly escrow amounts from borrowers that in many instances were too low after the borrowers' insurance premiums or taxes changed during their bankruptcy proceedings.

47.     As a result of Defendant's failure to analyze borrowers' accounts, many borrowers had a deficiency or shortage accrue in their accounts, including borrowers who made all of their mortgage payments pursuant to a court-approved plan under Chapter 13 of the U.S. Bankruptcy Code.

48.     On numerous occasions, after the borrower was discharged, Defendant attempted to collect on these accrued shortages and deficiencies, even though such attempts were impermissible without obtaining the required bankruptcy court approval.

49.     Defendant's failure to perform the required escrow analyses caused some borrowers to experience large payment shocks when they emerged from bankruptcy and discovered Defendant intended to collect escrow shortages that it had not previously identified, and that the borrowers otherwise had no way of anticipating.

50.     From around January 2011 to around June 2016, Defendant failed to conduct escrow analyses within the required time period for thousands of borrowers who had filed for bankruptcy.

**Defendant Mishandled Borrowers' Private Mortgage Insurance**

51.     Borrowers are generally required to purchase Private Mortgage Insurance ("PMI") when they obtain a mortgage but have a down payment of less than 20 percent of the

home's price, or when they refinance their mortgage but have less than 20 percent equity in their property.

52.     Pursuant to the Homeowners Protection Act ("HPA"), servicers are required to remove PMI and cease collecting premium payments from borrowers under certain circumstances, in some instances upon a borrower's request and in others automatically. Defendant failed to cancel as requested by the borrowers, or automatically terminate PMI, as required under the HPA, for several thousand borrowers.

53.     Pursuant to the HPA, there are two separate circumstances under which servicers must remove PMI:

>   (1) *Automatic Termination.* Servicers must automatically terminate a borrower's PMI on the loan's predetermined "termination date," which is the date when the principal balance of the mortgage is first scheduled to reach 78 percent loan-to-value ("LTV"), or, if the borrower is not current as of the termination date, the first day of the first month after the borrower becomes current on the loan; and
>
>   (2) *Borrower-Requested Cancellation.*  Servicers must cancel a borrower's PMI upon receipt of borrower's written request on the loan's "cancellation date," which is the date when the LTV is scheduled to reach 80% of the original value of the property, or the date on which the principal balance of the loan reaches 80% of the original value of the property based on actual payments.

54.     Defendant operated under an erroneous reading of the HPA's cancellation requirements. It required borrowers to reach a 75 percent LTV threshold, rather than the 80 percent the HPA requires, before it would honor a borrower's request for cancellation of PMI. Because Defendant operated under an erroneous understanding of the HPA, it also provided consumers with incorrect information in response to inquiries regarding their ability to have their PMI canceled.

55.     Defendant conducted a comprehensive review of its PMI procedures between January 1, 2013 and December 31, 2015, which found that in numerous instances Defendant

failed to accurately determine borrowers' termination dates, and as a result, Defendant failed to automatically terminate PMI on time for these borrowers.

56.     In failing to cancel and terminate PMI in compliance with the HPA, Defendant also continued to collect, and failed to return, PMI payments notwithstanding the HPA's requirements that it do so.

## VIOLATIONS OF THE CFPA

57.     Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

### Count I

*(Unfair Practices Related to In-Flight Modifications)*

58.     An act or practice is unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c).

59.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

60.     Defendant failed to identify loans with existing in-flight modifications and, as a result, failed to honor borrowers' loan modification agreements.

61.     In numerous instances, Defendant's actions caused or were likely to cause substantial injury to borrowers. These borrowers were negatively impacted by Defendant's transfer-process failures, which, among other things, caused significant delays in converting trial modifications to permanent ones. Delays in converting the modifications from trial to permanent

12

resulted in prolonged delinquency, and related additional interest payments and fees to borrowers, as well as added emotional stress.

62.     Borrowers could not reasonably avoid the injuries they suffered. Borrowers could reasonably expect that the agreements they entered into with their prior servicers would be honored by any subsequent servicer. They would have had no indication that Defendant would fail to perform as required under their modification agreements. And, in any event, borrowers lacked the ability to select another mortgage servicer.

63.     There is no countervailing benefit to competition or consumers from Defendant's failure to honor its contractual obligations with regard to the transferred loans it received.

## Count II

### *(Unfair Increases to Permanent Monthly Payments)*

64.     An act or practice is unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §§ 5531(c).

65.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

66.     Defendant unilaterally increased borrowers' permanent monthly payments from the trial plan payment amount after the borrowers successfully completed their trial period plans.

67.     In numerous instances between January 2013 and December 2015, Defendant improperly increased borrowers' permanent monthly payments, in many cases substantially. Some of these impacted borrowers defaulted on their modified loans, and some of those borrowers were foreclosed upon or otherwise lost their homes.

13

68.     Borrowers could not reasonably avoid the injuries they suffered, including the unilateral changes to the terms of their modification agreements. Trial-period plan notices informed borrowers that their monthly payment after permanent modification would not significantly change and that changes would be limited to changes to the borrowers' insurance or taxes.

69.     There is no countervailing benefit to competition or consumers from Defendant's unilateral increases in monthly payments.

**Count III**

*(Deceptive Foreclosure Hold Promises)*

70.     A representation, omission or practice is deceptive under the CFPA when it is likely to deceive a consumer acting reasonably under the circumstances, and where the representation, omission or practice is material.

71.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

72.     In numerous instances, Defendant told borrowers that it would not foreclose on them while their loss mitigation applications were pending. Despite these written promises, Defendant foreclosed on some borrowers while their loss mitigation applications or appeals were pending, even after Defendant had actually approved a borrower's loan modification.

73.     Defendant's promises were likely to mislead borrowers, who were entitled to reasonably rely on their servicer's written representations.

74.     Defendant's explicit representations were material to borrowers' financial decision-making with regard to their mortgages.

75.     Defendant's representations were deceptive in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## Count IV

### *(Deceptive Statements Regarding PMI Cancellation)*

76.     A representation, omission or practice is deceptive under the CFPA when it is likely to deceive a consumer acting reasonably under the circumstances, and where the representation, omission or practice is material.

77.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

78.     In numerous instances Defendant represented to otherwise eligible borrowers that they needed to reach 75% LTV on their mortgages in order to have their PMI premiums canceled.

79.     In fact, the HPA required otherwise eligible borrowers to reach 80% LTV on their mortgages in order to request cancellation of their PMI.

80.     Borrowers were entitled to reasonably rely on the express representations of their servicer.

81.     Defendant's statements were material to Borrowers' decisions about whether to seek cancellation of their PMI.

82.     Defendant's false statements regarding borrowers' obligations under the HPA were deceptive in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## VIOLATIONS OF RESPA

83.     RESPA and its implementing regulation, Regulation X, pertain to certain acts and practices related to "federally related mortgage loans," including servicer requirements related to notice of error and complaint resolution.

84.     The loans impacted by the allegations herein are federally related mortgage loans.

### Count V

*(Property Tax Payment Violations)*

85.     Section 6(g) of RESPA, 12 U.S.C. § 2605(g), states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

86.     The requirements of Section 6(g) are further explained in Regulation X, 12 C.F.R. § 1024.17(k)(1), which states, among other requirements: "[i]f the terms of any federally related mortgage loan require the borrower to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than 30 days overdue."

87.     Among other obligations, Section 17 of Regulation X requires servicers to disburse property tax payments in a timely manner, 12 C.F.R. § 1024.17(k)(1).

88.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

89.     In numerous instances between January 2012 and March 2015, Defendant failed to make disbursements for homeowners' property taxes on time, causing borrowers to incur unnecessary penalties.

90.     Defendant's failures to make borrowers' property tax disbursements on time violated 12 C.F.R. § 1024.17(k)(1).

91.     These violations also constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

**Count VI**

*(Annual Escrow Analysis Violations)*

92.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

93.     Section 17 of Regulation X requires servicers to conduct annual escrow analyses for borrowers, 12 C.F.R. § 1024.17(c)(3) and (f)(1).

94.     In numerous instances between 2011and 2016, Defendant failed to conduct timely escrow analyses for borrowers who filed for bankruptcy.

95.     Defendant's failure to conduct timely annual escrow analyses violated 12 C.F.R. § 1024.17(c)(3) and (f)(1).

96.     These violations also constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## VIOLATIONS OF THE HPA

### Count VII

*(Failure to Cancel PMI on Borrower Request)*

97.     Under the HPA, servicers are required, under certain conditions, to cancel a requirement for private mortgage insurance on a specific date called the "cancellation date." 12 U.S.C. § 4902(a).

98.     The "cancellation date," as defined by HPA, 12 U.S.C. § 4901(2), means:

(A)     With respect to a fixed rate mortgage, at the option of the mortgagor, the date on which the principal balance of the mortgage:
  (i)     Based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 80 percent of the original value of the property securing the loan; or
  (ii)    Based solely on actual payments, reaches 80 percent of the original value of the property securing the loan; and
(B)     With respect to an adjustable rate mortgage, at the option of the mortgagor, the date on which the principal balance of the mortgage:
  (i)     Based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 80 percent of the original value of the property securing the loan; or
  (ii)    Based solely on actual payments, first reaches 80 percent of the original value of the property securing the loan.

99.     The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

100.    In numerous instances, Defendant failed to cancel the private mortgage insurance of borrowers who had met the HPA's requirements and had requested cancellation on the borrowers' cancellation date, in violation of 12 U.S.C. § 4902(a).

101.    Defendant's failure to cancel private mortgage insurance as required violated 12 U.S.C. § 4902(a).

102.    These violations also constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

18

**Count VIII**

*(Failure to Terminate PMI Automatically)*

103.    Under the HPA, servicers are required to automatically terminate a borrower's

private mortgage insurance when the borrower's loan reaches its "termination date." 12 U.S.C.

§ 4902(b).

104.    The "termination date," as defined by the HPA, 12 U.S.C. § 4901(18), means:

(A)    With respect to a fixed rate mortgage, the date on which the principal
       balance of the mortgage, based solely on the initial amortization schedule
       for that mortgage, and irrespective of the outstanding balance for that
       mortgage on that date, is first scheduled to reach 78 percent of the original
       value of the property securing the loan; and

(B)    With respect to an adjustable rate mortgage, the date on which the
       principal balance of the mortgage, based solely on the amortization
       schedule then in effect for that mortgage, and irrespective of the
       outstanding balance for that mortgage on that date, is first scheduled to
       reach 78 percent of the original value of the property securing the loan.

105.    The Bureau incorporates by reference the allegations of Paragraphs 1 to 57.

106.    In numerous instances between January 1, 2013 and December 31, 2015,

Defendant failed to maintain accurate PMI termination dates for borrowers.  As a result,

Defendant failed to terminate those borrowers' PMI premiums on their scheduled termination

date, overcharging these borrowers for unnecessary PMI premiums in violation of 12 U.S.C. §

4902(b).

107.    Defendant's failure to terminate private mortgage insurance as required violated

12 U.S.C. § 4902(b).

108.    These violations also constitute violations of the CFPA. 12 U.S.C. §

5536(a)(1)(A).

**Prayer for Relief**

The Bureau, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

1.     Permanently enjoin Defendant from committing future violations of the CFPA, RESPA, and HPA, and enter such other injunctive relief as appropriate;

2.     Award such relief as the Court finds necessary to redress injury to consumers, including, but not limited to, rescission or reformation of contracts; refund of moneys; restitution; and payment of damages or other monetary relief;

3.     Award such relief as the Court finds necessary to disgorge Defendant of unlawful gains;

4.     Award civil money penalties against the Defendant;

5.     Award costs against the Defendant; and

6.     Award additional relief as the Court may deem just and proper.


Dated:  December 7, 2020                    Respectfully Submitted

                                            Attorneys for Plaintiff
                                            Bureau of Consumer Financial Protection,

                                            JOHN C. WELLS
                                            Deputy Enforcement Director

                                            RICHA S. DASGUPTA
                                            Assistant Deputy Enforcement Director

                                            */s/ Christian H. Woolley*
                                            Christian H. Woolley
                                            Senior Litigation Counsel
                                            Bureau of Consumer Financial Protection
                                            1700 G Street, NW

Washington, DC 20552
E-mail: christian.woolley@cfpb.gov
Phone: 202-435-9189
Pennsylvania Bar No. 205486

Jean M. Healey
Senior Litigation Counsel
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Email: jean.healeydippold@cfpb.gov
Phone: 202-435-7514
Massachusetts Bar No. 660456

J. Douglas Wilson
Senior Litigation Counsel
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
E-mail: doug.wilson@cfpb.gov
Phone: 202-435-9151
DDC Bar No: 991055